Jack I. GRONBERG et al., Appellants,

v.

Philip H. YORK, Appellee.

No. 1118.

Court of Civil Appeals of Texas, Tyler.

May 4, 1978.

Rehearing Denied June 22, 1978.

Joe B. Burnett, Arlen D. Bynum, Bradshaw & Bynum, Dallas, for appellants.

Ron W. Kessler, Feather, Kessler & Douglas, Dallas, for appellee.

MOORE, Justice.

This is a suit for commissions alleged to be due under an employment contract and for certain benefits alleged to be due under terms of a pension and retirement plan. The suit was instituted by appellee, Philip H. York, against his former employer, Dynamic Component Sales, Inc. (DCS); Jack I. Gronberg, its president, and Harry R. Aschan, Harold S. Hilton and Jack I. Gronberg, trustees of the Retirement Plan and Trust established by DCS, Inc. Appellee York sought recovery of commissions alleged to have been earned by him prior to termination of his employment. He also sought a recovery of his interest in the pension trust fund which had vested at the time of his termination. York further sought repayment from DCS for the amount of the contributions paid into the retirement fund, alleging that, under the retirement plan trust agreement, the plan was to have been funded solely by contributions from DCS. DCS, together with the other defendants, answered with a general denial. In response to special issues, the jury found that York was entitled to $6,983.67 in unpaid commissions; that DCS agreed with York to make all contributions to the pension plan; that DCS made contributions to the pension plan by deducting from York's monthly commissions; that as a result York was entitled to damages in the amount of $21,786, the amount he contributed to the fund; that the DCS Retirement Plan and Trust was indebted to York in the sum of $14,808 for his vested interest in the pension fund; that York did not waive his right to complain of the funding of the pension plan with funds withheld from his commissions; and that Jack I. Gronberg was the alter ego of DCS. After appellants' motion for judgment n. o. v. had been overruled, the trial court entered judgment on the verdict in favor of appellee York, from which appellants perfected this appeal.

We affirm in part and reverse and render in part.

The evidence shows that appellee was employed by DCS on August 1, 1967, as a manufacturer's representative. Appellant DCS, a Texas Corporation, with appellant Jack I. Gronberg as its president, were engaged in the business of representing various manufacturers in the sale of manufactured products on a commission basis. Although no formal contract of employment was made, it was mutually agreed that appellee's territory was the northern and western sections of the state, including Dallas and Fort Worth. It was also mutually agreed that appellee was to be paid on the basis of 70% of the commissions generated by him in his territory, out of which he was to pay his own expenses. The billing and collecting of all commissions were handled by DCS. After collecting the commissions, DCS issued a check to appellee for his 70%

and retained 30% of the commissions for corporate purposes. Other sales representatives employed by DCS in other areas were compensated on the same basis.

In August 1969 DCS adopted a pension and retirement plan. In implementing the plan DCS entered into a trust agreement with Jack I. Gronberg, Harry R. Aschan and appellee Philip H. York, as trustees, who agreed to administer the plan for the benefit of the employees. The employees consisted only of Mr. Gronberg; Harry R. Aschan, a sales representative in the Tulsa, Oklahoma area; a secretary who worked with Mr. Gronberg in the home office in Houston; and appellee, Philip H. York. Harold Hilton was later employed as a sales representative. The plan and trust indenture recited that the employer, DCS, was to fund the plan by making payments to the trustees for the purchase of life insurance policies on the employees who elected to become members and for deposits of cash to the auxiliary investment account from which certain stipulated amounts were to be paid on retirement. The indenture further provided that no contributions would be required of any member. For reasons hereinafter explained, DCS made no contributions to the trust fund. Instead, with the knowledge of the employees, DCS deducted each month from the commissions due the appellee and the other employees an amount sufficient to properly fund the plan, and paid such amount over to the trust fund. Each month, commencing in August 1969, DCS mailed appellee and the other salesmen a statement along with their monthly checks showing an amount withheld from their commissions which was used for payment to the pension trust fund.

On November 6, 1973, appellee addressed a letter to Gronberg, President of DCS, expressing dissatisfaction with certain changes in his sales territory and stating that he was terminating his employment as of November 30, 1973. In reply, Mr. Gronberg notified him on November 13, 1973, that his employment was terminated effective November 12, 1973.

After termination appellee made a demand on DCS for a commission on all invoices billed to customers in his territory for a period of ninety days after termination. He also demanded the vested portion of the pension trust fund due him under the terms of the plan. In addition to his having sought his unpaid commissions and his vested portion under the pension plan, appellee in his petition also sought damages in the amount of the contributions he made to the plan which he alleged were wrongfully deducted by DCS from his monthly commissions.

Upon trial, appellants admitted that appellee was entitled to $2,536.05 in unpaid commissions due for the period of November 1 to November 12. Appellants further admitted that he was entitled to the sum of $10,300 as his vested interest in the pension trust fund plus interest in the amount of $515.

Appellants contend by their sixth point that there is no evidence to support the jury finding on Special Issue No. 1 that appellee was entitled to $6,983.67 in unpaid commissions. In their seventh point appellants contend that even if there were some evidence to support the finding, the finding is nevertheless against the great weight and preponderance of the evidence. We find no merit in either contention.

■ As stated, appellants admitted that appellee was entitled to unpaid commissions from November 1 until November 12, 1973, in the amount of $2,536.05. Under the terms of the working agreement between appellee and DCS which existed prior to November 13, 1973, the evidence shows that the parties agreed that, in the event of termination, appellee was to be paid for all commissions thereafter booked in his territory for a period of 90 days. In the termination letter addressed to appellee on November 13, 1973, Mr. Gronberg stated: "You will be credited for invoices for 30 days past 12 November 1973 and payment on these will be made to you six months after 12 November 1973 . . . ." The evidence shows that DCS supplied appellee with a copy of the invoices for the 30-day

period as promised and that his commissions for the thirty days after November 12 amounted to $4,483.67. It thus becomes apparent that the jury's verdict finding appellee was entitled to $6,983.67 was the result of the jury's having combined the commissions due for the 30-day period with the undisputed sum of $2,536.05 due for the period of November 1 to November 12, with a miscalculation of $36.05. Although appellee offered evidence and contended he was entitled to commissions for ninety days after termination, the jury awarded him commissions for only a thirty-day period, about which he makes no complaint. We believe there is ample evidence to support the finding and have further concluded that such finding is not against the overwhelming weight and preponderance of the evidence. Accordingly, appellants' sixth and seventh points are overruled.

By their twelfth point appellants contend that the trial court erred in overruling their motion for new trial because there is no evidence or insufficient evidence to support the jury's finding to Special Issue No. 6A in which the jury found that the sum of $14,808 would fairly and reasonably compensate appellee for his vested portion of the pension fund.

Appellants admitted both in their pleadings and on trial that, under the plan and trust agreement, appellee was entitled to a vested interest in the pension fund. The only question before the jury was the amount. The evidence shows without dispute that shortly after appellee's termination the trustees delivered appellee the insurance policy held by the trust. It is also undisputed that the policy had a cash value of $4,544.77. Appellee admitted that he had received the policy and was not seeking a recovery of this portion of his vested interest. During the trial appellants admitted that his vested interest exclusive of the cash value of the policy amounted to the sum of $10,300 plus $515 accrued interest. The figure relied on by appellants was the vested interest set forth in the 1975 Annual Plan Review prepared by the fund's professional advisors. According to witness H. L.

Wendorf, an expert in the field of pensions trusts called by appellee, appellee's vested interest at the time of his termination amounted to the sum of $12,651.43 after excluding the $4,544.77 cash value of the insurance policy which had previously been delivered to appellee. He further testified that the interest from the date of termination on such amount was $2,156.68 and appellee was therefore entitled to the sum of $14,808.11. The jury found that appellee's vested portion of the trust fund, together with interest, was $14,808. Thus, it is apparent that the jury chose to follow the testimony of appellee's expert witness as to the present value of the vested portion of the fund rather than the evidence of the lesser value offered by appellants. Where the evidence is conflicting, as here, it is within the jury's province to weigh all of the evidence and to decide what credence should be given to the testimony of each witness. *Muro v. Houston Fire and Casualty Insurance Company,* 329 S.W.2d 326 (Tex.Civ.App.—San Antonio 1959, writ ref'd n. r. e.); *Martin v. Johnson,* 365 S.W.2d 429 (Tex.Civ.App.—Eastland 1963, no writ history). Viewing the evidence in a light most favorable to the jury's finding, we have concluded that there is ample evidence of probative force to support the finding and judgment based thereon. Accordingly, appellants' twelfth point is overruled.

Under their thirteenth point appellants seek a reversal on the ground that the court erred in admitting into evidence, over their objection, the testimony of appellee showing that for two years the percentage of the business done by him in his territory was greater than that of all the other business done by DCS combined. Appellants argue that such testimony was immaterial and prejudicial in that it was calculated to cause the jury to sympathize with appellee's position. We do not agree.

Appellee was permitted to testify that his percentage of commissions produced for DCS was more than 50% of all the commissions earned by DCS during the years 1970–1972. In our view this evidence was mate-

rial for two reasons. First, one of the issues in the court below was whether appellant Gronberg had breached an agreement with appellee whereby appellee would participate in the ownership of the company. Gronberg denied the existence of such agreement. Consequently, appellee's testimony showing he was responsible for a major portion of the commissions earned by DCS was material in that it lends credence to his position that Mr. Gronberg agreed to allow him to participate in the ownership of the corporation due to his outstanding ability. Further, the evidence was material to rebut appellants' testimony implying that appellee had not properly performed his work due to a drinking problem and a reluctance to travel. We think the testimony was clearly relevant, material and therefore admissible since it tended to rebut testimony relating to material facts relied on by appellants. *Lone Star Gas Co. v. State,* 137 Tex. 279, 153 S.W.2d 681 (1941); *Martin v. Johnson,* supra. Appellants' thirteenth point is overruled.

In points 8 through 11 appellants, DCS and Jack I. Gronberg, contend that there is no evidence to support the jury's findings on Special Issues Nos. 3 and 4, or in the alternative that such findings are against the overwhelming weight and preponderance of the evidence. Further, they contend that such findings will not support a judgment in favor of the appellee based on the theory of conversion.

In response to Special Issues Nos. 3 and 4, the jury found that DCS made contributions to the pension plan for the benefit of York by making deductions from his portion of the commissions and that the sum of $21,786 would reasonably compensate him for the deductions made therefrom by DCS. Appellee's theory of recovery on this phase of the case, as alleged in his petition, was that DCS had converted the funds to its own use and benefit by paying the same into the pension trust fund. He alleged that DCS was therefore liable to him for conversion of the funds. Contrary to appellants' contention, the undisputed proof shows that DCS withheld approximately $380 per month out of appellee's monthly

commissions for a period of over four years and paid the same into the pension trust fund. Even so, we do not believe the proof was sufficient to establish a cause of action for conversion.

■ In this instance, the chattel alleged to have been converted is money. It is the rule in this state that money is subject to conversion only when it can be described or identified as a specific chattel. *Story v. Palmer,* 284 S.W. 331 (Tex.Civ.App.—El Paso 1926, no writ history); *Hull v. Freedman,* 383 S.W.2d 236 (Tex.Civ.App.—Fort Worth 1964, writ ref'd n. r. e.).

In 14 Tex.Jur.2d *Conversion* sec. 11, the rule is stated as follows:

"Money may be the subject of conversion if it can be described or identified as a specific chattel; that is, there may be a conversion where there is an obligation to return specific money, but not where an indebtedness may be discharged by the payment of money generally."

■ Obviously, appellee does not seek the return of specific money but is only seeking repayment of money generally which he alleged was wrongfully withheld from his commissions. Consequently, the judgment on this phase of the case cannot be sustained on the theory of conversion.

Further, we are of the opinion that conversion was not established for yet another reason. Appellee does not dispute the fact that he knew from the date the pension plan was adopted that funds were withheld from his monthly commission each month for a period of over four years. It is undisputed that DCS never elected to fund the plan with corporate funds. According to the testimony of Harry Aschan, one of the trustees, the reason why DCS never commenced funding the plan was because it would have been impossible for DCS to have made the necessary contributions to the fund out of the thirty percent income it received from the monthly commissions. The evidence shows that after the plan had been in operation for approximately one year it was discovered that, because of a mistake on the part of the actuary, the employees had not made sufficient contributions to properly fund the plan during

the first year. Upon being notified that his share of the deficit was approximately $800, appellee directed DCS to take such amount from his next monthly commission check and pay it over to the fund. Appellee admitted that he knew the monthly payroll deductions were turned over to the fund and testified that he understood that the amount of his contributions thereto amounted to deferred income and that he knew he was not paying any income tax thereon. Although this procedure was followed for more than four years prior to the date of his termination, he admitted that he never registered any complaint until he filed the present suit in November 1975. His only explanation as to why he never made any complaint was that he never fully understood the terms of the pension plan indenture until after his termination when his accountant advised him that the pension plan indenture required DCS to fund the plan wholly out of corporate funds. According to the testimony of experts in the field of funding pension plans, there is nothing wrong with the employees funding the plan out of their earnings even though the plan may stipulate that it is to be funded by the employer, so long as each employee consents that his funds be used for that purpose.

■ Where a person has knowledge that funds are being deducted from his weekly earnings for the purpose of establishing a pension fund for his benefit and he does not object or forbid the same to be done, he certainly acquiesces in such taking and cannot base an action of conversion on such circumstances. *Gulf, C. & S. F. R. Co. v. Pratt,* 183 S.W. 103 (Tex.Civ.App.—Beaumont 1916, writ ref'd). In our view the evidence in the instant case conclusively establishes that the appellee knew his funds were being withheld and paid into the pension trust fund for his benefit. Moreover, he asserted a claim for the benefits due under the plan and has been awarded recovery for such amount. Thus, we think appellee must be held to have consented to the action of DCS in withholding such amount. Consequently, for this additional reason we hold that appellee failed to establish a cause of action for conversion.

Under the fourth and fifth points appellants, DCS and Jack Gronberg, challenge the jury's finding to Special Issue No. 2, wherein the jury found that DCS agreed with appellee York to make all contributions to the pension plan from corporate funds. Appellants contend that there is no evidence to support such finding, or in the alternative that the finding and the judgment based thereon are against the overwhelming weight and preponderance of the evidence.

■ While the jury found that DCS agreed with York to fund the plan out of corporate funds, we fail to find any evidence to support such finding. On this appeal, appellee seems to argue that the pension plan indenture constituted an agreement between him and DCS that DCS would fund the plan solely out of corporate funds. Based on this premise he argues that since the evidence conclusively shows that DCS not only failed to fund the plan out of corporate funds but also used his funds to implement the plan, he suffered damages in the amount of $21,786, the amount withheld by DCS. Therefore he maintains that the judgment may be sustained on the theory of breach of contract. We cannot agree with this proposition.

The pension plan indenture was between DCS and the trustees of the plan. Appellee was not a party to the agreement. Under Article V, sec. 5.01, the plan provides as follows:

"Employer shall make due and timely payments to the Trustees for the purchase of ordinary life contracts and for deposits in the auxiliary investment account of such amounts as may be necessary from time to time, according to the certification of the Trustees, to provide the following benefits to members or their beneficiaries: (then follows the enumerated benefits)"

Sec. 5.02 provides:

"*Employee contributions*: No contributions shall be required of any member."

In Article XI, sec. 11.01, it is provided:

"*Declaration of interest*: It is the expectation of employer that it will contin-

ue this plan and payment of its contributions hereunder indefinitely, but continuance of the plan is not assumed as a contractual obligation of the employer. The plan is entirely voluntary and the right is reserved by the employer at any time to suspend or discontinue its contributions hereunder and/or to terminate the plan."

Under Article XII, sec. 12.01, the plan provides:

"*Not contract of employment*: The adoption and maintenance of this plan shall not be deemed to constitute a contract between employer and any employee or to be considered for inducement or condition of the employment of any person."

The plan adopted in the instant case clearly shows that DCS was to pay the entire cost of the plan but that such payments were to be made on a voluntary basis. DCS was authorized to suspend the payment at any time it saw fit. The plan further shows that no contractual relationship was intended or created between DCS and its employees. Thus, the obligation to fund the plan on the part of DCS was purely a gratuitous undertaking.

■ The nature of the rights conferred upon an employee by a private pension or retirement fund depends on the provisions of the particular plan. Many plans embrace declarations that the employee shall acquire no enforceable rights under the plan which, at least in the case of noncontributory plans, the courts have frequently respected. 60 Am.Jur.2d *Pension & Retirement Funds* sec. 74; *Hughes v. Encyclopedia Britannica, Inc.,* 1 Ill.App.2d 514, 117 N.E.2d 880, 42 A.L.R.2d 456 (1954).

The facts of this case do not fall within the category of those situations in which the employee is attempting to collect pension benefits after he has served the required number of years so as to become eligible for a pension under the plan adopted by his employer. In effect, by contending that the indenture constitutes a contract between him and his employer and that the failure to fund the plan solely out of corporate funds constitutes a breach of contract, appellee seeks to impose a duty on his employer to abide by the provisions of the plan as to method of funding.

Because the plan by its terms expressly negatives a contractual obligation on the part of the employer to continue and maintain the plan and further states that the funding of the plan is entirely voluntary, we conclude that the pension plan indenture does not constitute a contractual agreement whose provisions as to funding can be enforced by an employee. *Hughes v. Encyclopedia Britannica,* supra. See also *Webster v. Southwestern Bell Tel. Co.,* 153 S.W.2d 498 (Tex.Civ.App.—El Paso 1941, writ ref'd); *Shear v. Harrington,* 266 S.W. 554 (Tex.Civ.App.—Waco 1924, no writ history). It therefore follows that the judgment cannot be sustained on the theory that the failure by DCS to fund the plan solely out of corporate funds amounted to a breach of contract.

We do not reach appellants' fifth point challenging the jury's answer on the ground that it is against the overwhelming weight and preponderance of the evidence. However, if such point were reached, we would overrule it.

Accordingly, that portion of the judgment awarding appellee the sum of $21,786 is reversed and judgment is hereby rendered that appellee take nothing on his claim against DCS and Jack I. Gronberg for the recovery of his contributions to the pension plan. In all other respects the judgment of the trial court is affirmed.

Affirmed in part and reversed and rendered in part.

## ON MOTION FOR REHEARING

On Motion for Rehearing appellee expresses concern because we addressed ourselves to the issue of conversion. He asserts that since appellants did not specifically raise the issue in their brief, we failed to follow the rules of appellate procedure by deciding an issue not raised in the brief.

Our reason for disposing of the issue of conversion was due to the fact that the only

theory upon which appellee sought a recovery in his pleadings was that DCS had wrongfully converted the funds withheld from appellee's monthly commission check. Furthermore, the jury found that DCS agreed with York to make all contributions to the fund and also that DCS made the contributions with funds deducted from his commissions. Thus, based on the pleadings and the foregoing findings, we concluded that the issue of wrongful conversion was raised. When appellants in their brief challenged the foregoing findings on the ground that the findings were not supported by the evidence, we concluded, and still believe, that the issue of conversion became a viable issue calling for some disposition even though appellants did not specifically discuss any of the elements of conversion in their brief.

Turning to the contract feature of the case, appellee points out that the breach of contract theory, although not specifically pled, was tried and submitted to the jury by consent. Further he points out that appellants admitted in their brief that "the ultimate issue as to the contributions to the pension plan is whether or not DCS breached any agreement with plaintiff as to funding of the plan and the manner in which it was funded." We recognize, as we did in our original opinion, that the breach of contract theory was tried by consent. However, as we attempted to point out in our original opinion, there is no evidence that DCS ever made any agreement with York individually, promising him that it would make all contributions to the pension plan out of corporate funds. York signed the pension plan agreement in his capacity as a trustee. Thus, the pension plan agreement cannot be construed as a private agreement between York and DCS. On Motion for Rehearing appellee contends that he was a third party beneficiary under the pension plan agreement. Based on such premise, he argues that since DCS contracted with the trustees to fund the plan and failed to do so, it breached its contract and therefore he had a right, as third-party beneficiary, to enforce the funding provisions of the plan and recover damages in the amount DCS deducted from his monthly commissions and paid into the trust fund. We are not in accord with this proposition. Had the pension plan agreement not been a gratuitous undertaking on the part of DCS, appellee might conceivably have been able as third-party beneficiary to sue and recover on the theory of breach of contract. However, since the agreement to fund the plan was purely voluntary, no duty on the part of DCS arose, and as a result appellee acquired no right to assert a cause of action for the breach thereof. *Avinger v. Campbell*, 499 S.W.2d 698, 704 (Tex.Civ.App.— Dallas 1973) writ ref'd n. r. e., 505 S.W.2d 788 (Tex.1974). The fact that the jury found that appellee did not waive his right to complain of the funding of the plan with funds withheld from his commissions cannot serve to create a cause of action for breach of a gratuitous contract where no such cause of action existed in the first instance. The motion is overruled.